W. H. Gunlocke Chair Co. v. Commissioner.
W. H. Gunlocke Chair Co. v. Commissioner
Docket No. 109983.
United States Tax Court
1943 Tax Ct. Memo LEXIS 92; 2 T.C.M. (CCH) 885; T.C.M. (RIA) 43443; October 4, 1943
*92 Scott Stewart, Esq., 31 Exchange St., Rochester, N. Y., for the petitioner. Harold D. Thomas, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The present case involves deficiencies in income and excess-profits taxes of $22,330.13 and $132.17, respectively, for the taxable year ended June 30, 1939. The only question in issue is whether the petitioner corporation was availed of by its stockholders during the year to prevent the imposition of surtaxes on them, by allowing the corporation's gains to accumulate instead of being distributed, and is therefore subject to the surtax imposed by section 102, Revenue Act of 1938. That section raises a prima facie presumption of such intent if the petitioner is a holding company and makes determinative of purpose the accumulation of profits beyond the reasonable needs of the business, which can be rebutted only by a fair preponderance of the evidence. Findings of Fact Petitioner's return was filed with the collector of internal revenue for the 28th district of New York. Petitioner was incorporated on October 21, 1902 under the laws of New York for the purpose of engaging in the manufacture and sale of chairs, furniture *93 and fittings of all kinds. Its office and manufacturing plant are at Wayland, New York, a small town about forty miles south of Rochester. During the taxable year and for some years before, petitioner's principal business was the manufacture and sale of chairs for office use. During the taxalbe year from 11 to 15 percent of its products consisted of upholstered furniture for offices. The office furniture which petitioner manufactures is of high grade. Petitioner's original capital, as provided in the certificate of incorporation, was $50,000, consisting of 500 shares of the par value of $100 per share. On August 14, 1919 petitioner, with the unanimous consent of all its stockholders, amended its certificate of incorporation so as to authorize it to have capital stock of $400,000, divided into 2,000 shares of preferred stock with a par of $100 per share, redeemable at $105 the share, and 2,000 shares of common stock of a par value of $100 the share, the preferred stock being entitled to a cumulative dividend of $8 the share per annum. In 1925 petitioner again amended its certificate of incorporation so as to authorize it to issue 2,000 shares of new preferred stock of a par value *94 of $100 the share, the new stock to be entitled to a cumulative dividend $6of the share per annum. Thereupon all the previously outstanding preferred stock was retired either by payment of its redemption price in cash or by exchange for the new six percent preferred stock. A certificate of reduction of capital stock was then filed with the Secretary of State of New York so that petitioner's authorized capital thereafter consisted of 2,000 shares of common and 2,000 shares of six percent preferred stock, each of a par value of $100 the share. The six percent preferred stock was cumulative as to dividends and in the event of liquidation its holders were entitled to $100 the share plus any accrued dividends before distributions could be made on the common stock. All or any part of this preferred stock could at the option of the board of directors and upon two months' notice be redeemed at any time after five years from March 1, 1925 by paying $105 the share plus any accrued dividends, but in the event of such redemption the stock was to be cancelled and the capital stock reduced by appropriate statutory proceedings. The six percent preferred stock had no voting power unless and until *95 dividends thereon should be in default for a period of two years, after which it had equal voting power, share for share, with the common stock. If after default the arrears in dividends were paid the common stock again regained excrusive voting power. From 1923 until the beginning of the taxable year there were outstanding 1,242 1/2 shares of common stock. On December 8, 1938, and during the taxable year, petitioner purchased 325 1/2 shares of its common stock from the estate of Charles Scales for $20,000 and retired these shares. Scales was one of the founders of petitioner and his estate was in need of cash. At the close of the taxable year the common stock outstanding was 917 shares which were all held by petitioner's officers, who were also its directors, as follows: No. of
Per-
Shares
cent
H. G. O'Connor, President
107.1
11.7
Ernest Child, Vice-President
87.5
9.5
John Stahle, Secretary
35.7
3.9
Howard W. Gunlocke, Treasurer
686.7
74.9 With the exception of Howard W. Gunlocke, the above officers had held the stated amounts of shares for a number of years. For several years before 1939 Howard W. Gunlocke had owned 150 shares of the common stock. On *96 October 10, 1938 he received 534.7 shares as a distribution from the principal of a trust created under the will of his mother, Anne H. Gunlocke. The income of this trust had been distributable to him since 1932 when he became of age. The principal of the trust was distributable to him at any time in the discretion of the trustees but not later than 1946. The president, H. G. O'Connor, resided in Philadelphia, Pennsylvania, and John Stahle in New York City. Ernest Child, vice-president, and Howard W. Gunlocke, treasurer, resided in Wayland, New York. Howard W. Gunlocke became actively engaged in the business in 1935. His father, W. H. Gunlocke, had been treasurer for a number of years before his death in 1937. From 1935 on Howard W. Gunlocke was quite familiar with the petitioner's manufacturing operations and finances. At the close of the taxable year there were 1,215 shares of preferred stock outstanding, of which Howard W. Gunlocke owned 149 shares. Most of the remaining preferred stock at that time, and since its issuance, was owned in small lots by a substantial number of individuals who resided in or near Wayland, New York, and who were for the most part friends of petitioner's *97 officers or employees of petitioner. On June 30, 1932 the par of the outstanding preferred stock was $189,500. The par of the preferred stock purchased or retired by petitioner thereafter was as follows: For the year ended June 30, 1933
$ 12,850.00
1934
1,000.00
1935
1,400.00
1936
500.00
1937
5,100.00
1938
22,650.00
1939
24,500.00
1940
36,400.00
1941
36,500.00
1942
48,600.00
Total
$189,500.00 There was no legal obligation on the part of petitioner to make the above purchases. During the two or three depression years and up to 1936 or 1937 most of the preferred stock purchased was acquired at a discount from individuals who desired the money for their stock because dividends had not been paid or whose circumstances necessitated the raising of money. For a period of two or three years, beginning in 1932, petitioner's plant was operating only part-time. During the year ended June 30, 1932 and again in 1933 petitioner paid only a portion of the preferred stock dividends, and no dividends in 1934; but the dividend arrears were paid in full by the year ended June 30, 1937. By 1937 conditions were much better and petitioner was then glad to buy up any preferred stock *98 it could obtain. The purchases in 1938 and 1939 and thereafter were for the most part not occasioned by any particular demands from the preferred stockholders, but because of the desire of the officers and common stockholders to avoid in the future the risk of losing control of the company which had faced them during the depression years. The purchases during the taxable year in the par amount of $24,500 were mostly in small amounts throughout the year and the aggregate purchase price was $21,770. The same is true of the year ended June 30, 1940 when the amount purchased was $36,400 par value and the aggregate purchase price was $36,377.50. Upon the death of W. H. Gunlocke in 1937 petitioner collected $50,000 insurance on his life. During the years 1914 to 1918, inclusive, petitioner paid dividends of approximately $10,000 the year on its common stock. There was no preferred stock outstanding during those years. In 1921 petitioner paid a stock dividend of common on common in the amount of $11,000. A similar stock dividend in the amount of $53,250 was paid in 1923. The amounts of such stock dividends were charged to the surplus account on petitioner's books. Various tables were *99 put into evidence by both respondent and the petitioner. We incorporate all of them herein by reference. For the sake of brevity only the more significant are set out herein. The following shows the net sales, book income, cash-dividends, current assets, current liabilities, cash and securities, and surplus as shown by petitioner's books for the years 1919 to 1940, inclusive: Book Income
or (Loss)
After
Deducting
Reserve for
Federal
Cash Dividends
Year Ended
Net Sales
Income Tax
On Preferred
On Common
12/31/19
$562,010.87
$75,147.70
$ 1,082.22
$20,000.00
12/31/20
723,446.97
65,685.84
13,665.86
750.00
12/31/21
346,976.55
(44,332.83)
15,755.79
11,000.00
12/31/22
514,821.34
23,408.56
15,942.20
14,200.00
12/31/23
625,233.55
51,535.31
15,925.44
14,910.00
12/31/24
686,539.27
53,826.23
15,981.11
14,910.00
12/31/25
665,933.25
66,817.76
11,535.57
14,910.00
12/31/26
640,266.36
22,265.09
10,604.64
14,910.00
12/31/27
727,907.25
20,693.89
10,947.52
14,910.00
12/31/28
907,267.72
(3,153.76)
11,207.53
14,910.00
6/30/29
561,514.52
61,109.68
5,728.50
7,455.00
(6 months)
6/30/30
763,216.71
40,901.37
11,359.98
14,910.00
6/30/31
407,769.45
(60,716.40)
10,937.00
13,282.50
6/30/32
238,474.28
(67,190.95)
7,101.50
6,419.00
6/30/33
202,875.93
(18,590.71)
888.25
6/30/34
275,068.72
7,425.64
6/30/35
373,406.54
23,504.12
15,622.50
6/30/36
780,124.66
68,148.92
15,671.50
6/30/37
966,725.83
48,497.98
22,839.75
6/30/38
751,780.20
31,680.73
9,710.87
6/30/39
860,852.11
95,652.44
7,674.00
6/30/40
866,329.99
75,003.56
5,357.62
*100 Current Assets
Current
at Close of
Liability at
Year (Gross
Close of Year
Cash &
Assets Less
(Incl. Current
Securities
Surplus at
Capital
Fed. Inc.
at Close of
Close of
Year Ended
Assets)
Taxes)
Year
Year
12/31/19
$388,450.90
$114,884.46
$ 42,529.31
$218,553.48
12/31/20
454,189.01
49,420.55
42,097.08
257,018.46
12/31/21
369,116.50
78,100.41
41,877.20
174,929.84
12/31/22
402,470.93
98,224.03
8,696.46
174,976.73
12/31/23
436,398.41
102,501.61
9,577.53
144,549.17
12/31/24
508,331.73
140,294.10
14,174.82
170,874.56
12/31/25
543,845.25
157,102.66
25,272.30
196,246.75
12/31/26
555,600.63
153,392.70
21,823.65
193,736.76
12/31/27
538,293.96
130,495.96
34,662.24
163,104.82
12/31/28
479,534.64
92,077.75
27,224.01
148,923.33
6/30/29
521,315.59
82,557.49
31,584.44
204,877.33
(6 months)
6/30/30
486,178.82
33,541.85
62,840.70
222,176.34
6/30/31
* 393,836.93
34,385.80
63,324.75
130,872.78
6/30/32
** 305,890.39
12,051.46
60,309.15
54,814.86
6/30/33
296,109.50
23,592.96
57,205.87
19,540.74
6/30/34
312,215.02
18,145.19
50,990.13
33,089.09
6/30/35
359,498.17
62,009.53
18,469.74
64,920.22
6/30/36
437,415.02
84,825.69
58,758.20
121,204.52
6/30/37
463,563.51
116,594.90
26,515.67
147,638.75
6/30/38
418,774.51
38,528.15
135,048.88
200,398.73
6/30/39
482,457.33
51,117.94
180,811.01
303,339.95
6/30/40
509,676.00
63,623.42
128,667.53
372,726.23
*101 The following are the balance sheets from petitioner's books at the close of each of the fiscal years 1933 to 1940, inclusive: Assets
6/30/33
6/30/34
6/30/35
6/30/36
Cash
$ 46,485.82
$ 40,270.08
$ 7,749.69
$ 48,038.15
Notes Receivable
2,682.85
2,307.72
1,593.72
Accounts Receivable (less reserve for bad
debts)
42,043.99
64,743.45
115,455.25
140,302.40
Inventories
158,711.88
150,916.60
179,856.15
194,194.29
Investments: Deposits with Bldg. & Loan Associa-
tions
Obligations of United States
Stock of domestic corps
10,720.05
10,720.05
10,720.05
10,720.05
Life Insurance - Cash Value
16,532.80
17,520.42
18,877.00
20,323.78
Loans
20,218.00
23,509.93
22,011.28
16,508.27
Capital Assets: Lands
1,983.78
1,983.78
1,983.78
1,983.78
Buildings
126,487.22
126,487.22
128,409.53
128,409.53
Machinery
89,066.73
89,750.73
94,267.32
96,515.61
Misc. Capital Assets
16,332.15
16,416.03
16,613.03
16,907.53
Other Misc. Assets
1,396.96
1,851.64
2,521.03
5,734.36
TOTAL ASSETS
$529,979.38
$546,852.78
$600,771.83
$681,231.47
Liabilities
Notes Payable
$ 7,000.00
$ 3,500.00
$ 5,000.00
Accounts Payable
16,592.96
1,818.38
40,196.81
$ 56,761.55
Accrued Expenses
1,723.87
5,278.05
15,586.24
Reserve for Depreciation
180,492.35
189,678.10
169,301.68
173,894.21
Reserve for Securities
5,453.33
6,040.40
6,040.40
3,307.05
Reserve for Fed. Taxes
966.74
3,764.01
Other Liabilities
10,136.20
7,770.66
12,477.90
Capital Stock: Preferred
176,650.00
175,650.00
174,250.00
173,750.00
Common
124,250.00
124,250.00
124,250.00
124,250.00
Surplus
19,540.74
33,089.09
64,920.22
121,204.52
TOTAL LIABILITIES
$529,979.38
$546,852.78
$600,771.83
$681,231.47
*102 Assets
6/30/37
6/30/38
6/30/39
6/30/40
Cash
$ 17,803.42
$118,836.63
$151,998.76
$ 93,161.68
Notes Receivable
1,325.00
1,063.51
Accounts Receivable (less reserve for bad
debts)
191,470.55
130,071.37
151,993.35
168,696.67
Inventories
208,986.33
142,005.67
143,741.46
208,383.91
Investments;
Deposits with Bldg. & Loan Associa-
tions
5,000.00
5,000.00
Obligations of United States
7,500.00
15,100.00
22,900.00
Stock of domestic Corps
8,712.25
8,712.25
8,712.25
7,605.85
Life Insurance - Cash Value
21,790.71
Loans
6,361.41
4,656.25
2,589.82
Capital Assets:
Lands
3,386.40
3,386.40
3,386.40
3,183.78
Buildings
131,962.13
131,962.13
131,962.13
136,801.39
Machinery
116,655.92
121,717.27
126,959.54
144,015.06
Misc. Capital Assets
16,586.52
15,324.94
11,349.55
11,842.55
Other Misc. Assets
7,113.84
5,928.84
3,321.69
3,927.89
TOTAL ASSETS
$732,154.48
$691,165.26
$756,114.95
$805,518.78
Liabilities
Notes Payable
$ 15,000.00
Accounts Payable
62,840.46
$ 20,380.81
$ 18,448.47
$ 41,256.79
Accrued Expenses
15,242.25
14,278.88
* 32,669.47
** 22,366.63
Reserve for Depreciation
171,076.57
176,806.13
183,274.81
188,293.28
Reserve for Securities
3,944.26
5,182.25
5,182.25
4,075.85
Reserve for Fed. Taxes
Other Liabilities
23,512.19
3,868.46
Capital Stock:
Preferred
168,650.00
146,000.00
121,500.00
85,100.00
Common
124,250.00
124,250.00
91,700.00
91,700.00
Surplus
147,638.75
200,398.72
303,339.95
372,726.23
TOTAL LIABILITIES
$732,154.48
$691,165.26
$756,114.95
$805,518.78
*103 The following is an analysis showing gross income, deductions and net income (or loss) as shown by petitioner's books for the fiscal years ended June 30, 1933 to June 30, 1940, inclusive: Analysis of Net Income (or Loss) per Books
Gross Income
6/30/33
6/30/34
6/30/35
6/30/36
Gross sales, less returns & allowances
$236,045.93
$275,068.72
$373,406.54
$780,124.66
Inventory, beginning of year
158,690.92
158,547.93
150,716.59
179,421.87
Purchases
76,500.97
113,300.65
184,081.59
369,031.46
Cost of Manufacturing
73,831.14
79,552.60
114,815.64
238,633.64
Total
$309,023.03
$351,401.18
$449,613.82
$787,086.97
Less: Inventory, end of year
156,470.93
150,716.59
179,421.87
194,194.29
Cost of goods sold
$152,552.10
$200,684.59
$270,191.95
$592,892.68
Gross income from manufacturing
$ 83,493.83
$ 74,384.13
$103,214.59
$187,231.98
Other income
3,248.47
5,251.34
4,388.12
9,347.51
Total Gross Income - All sources
$ 86,742.30
$ 79,635.47
$107,602.71
$196,579.49
Deductions
Compensation of officers
$ 14,108.23
$ 15,146.55
$ 7,047.71
$ 8,250.00
Salaries, wages and commissions
9,309.11
21,933.69
37,303.80
40,352.83
Taxes
2,901.06
1,089.85
2,901.50
4,737.46
Bad Debts
4,447.07
8,680.05
2,703.39
8,105.89
Depreciation
9,778.40
9,185.75
4,265.62
4,592.53
Other expenses
* 64,789.14
15,217.20
26,112.56
49,048.99
Total Deductions
$105,333.01
$ 71,253.09
$ 80,334.58
$115,087.70
Net Income (or Loss) per Books
($18,590.71)
$ 8,382.38
$ 27,268.13
$ 81,491.79
*104 Analysis of Net Income (or Loss) per Books
Gross Income
6/30/37
6/30/38
6/30/39
6/30/40
Gross sales less returns & allowances
$966,725.83
$751,789.20
$860,852.11
$900,618.14
Inventory, beginning of year
194,194.29
208,986.33
142,005.67
139,690.46
Purchases
438,320.43
278,281.94
322,992.44
364,155.96
Cost of Manufacturing
332,034.51
228,009.42
246,262.98
296,700.73
Total
$964,549.23
$715,277.69
$711,261.09
$800,547.15
Less: Inventory, end of year
208,986.33
142,005.67
143,741.46
202,851.01
Cost of goods sold
$755,562.90
$573,272.02
$567,519.63
$597,696.14
Gross income from manufacturing
$211,162.93
$178,508.18
$293,332.48
$302,922.00
Other income
11,691.35
10,615.81
8,641.31
10,547.57
Total Gross Income - All sources
$222,854.28
$189,123.99
$301,973.79
$313,469.57
Deductions
Compensation of officers
$ 45,000.00
$ 33,233.33
$ 44,900.00
$ 52,950.53
Salaries, wages and commissions
27,368.07
26,752.20
27,163.00
28,477.31
Taxes
15,026.57
15,329.58
18,072.15
22,834.03
Bad Debts
3,464.51
2,803.04
2,767.24
2,757.37
Depreciation
5,034.39
6,887.94
7,096.42
7,763.32
Other expenses
67,154.53
62,510.30
78,430.50
* 106,629.92
Total Deductions
$163,048.07
$147,516.39
$178,429.31
$221,412.48
Net Income (or Loss) per Books
($59,806.21)
$ 41,607.60
$123,544.48
$ 92,057.09
*105 The analysis of surplus as shown by petitioner's books for the fiscal years 1933 to 1936, is as follows: 6/30/33
6/30/34
6/30/35
6/30/36
Surplus at beginning of year
$ 54,814.86
$ 19,540.74
$ 33,089.09
$ 64,920.22
Add: (Credit)
Net income (or loss) per books
(18,590.71)
8,382.38
27,268.13
81,491.79
Revaluation - Adjustment of depreciation
24,643.04
Discount on preferred stock purchased
100.28
Discount on common stock purchased
Cash value life insurance
Other credits
7,166.70
3,711.60
Total
$ 36,224.15
$ 35,089.82
$ 85,000.26
$150,223.89
Deduct: (Debit)
Dividends paid - Cash
On preferred stock
$ 888.25
$ 15,622.50
$ 15,671.50
On common stock
Reserve for Fed. income tax
$ 966.74
3,764.01
13,342.87
Other debits
15,795.16
1,033.99
693.53
5.00
Total
$ 16,683.41
$ 2,000.73
$ 20,080.04
$ 29,019.37
Surplus at end of year
$ 19,540.74
$ 33,089.09
$ 64,920.22
$121,204.52
The analysis of surplus as shown by petitioner's books for the fiscal years 1937 to 1940, is as follows: 6/30/37
6/30/38
6/30/39
6/30/40
Surplus at beginning of year
$121,204.52
$147,638.75
$200,398.73
$303,339.95
Add: (Credit)
Net income (or loss) per books
59,806.21
41,607.60
123,544.48
92,057.09
Revaluation - Adjustment of depreciation
2,389.39
Discount on preferred stock purchased
728.50
1,852.00
* 2,730.00
58.59
Discount on common stock purchased
* 12,550.00
Cash value life insurance
28,453.38
Other credits
141.24
2,106.20
507.10
* 76.50
Total
$184,269.86
$221,657.93
$339,806.81
$395,455.63
*106 Deduct: (Debit)
Dividends paid - Cash
On preferred stock
** $ 22,839.75
$ 9,710.17
$ 7,674.00
$ 5,357.62
On common stock
Reserve for Fed. income tax
11,308.23
9,926.87
27,892.04
17,053.53
Other debits
2,482.93
1,622.16
900.82
318.25
Total
$ 36,630.91
$ 21,259.20
$ 36,466.86
$ 22,729.40
Surplus at end of year
$147,648.95
$200,398.73
$303,339.95
$372,726.23
A schedule showing, for the years 1928 to 1942, inclusive, (1) net sales, (2) cost of operations, (3) Gross assets (other than fixed assets and deferred charges), and (4) ratio of (2) to (3), is as follows: Gross Assets
(Other than
Fixed Assets
and Deferred
charges) -
Average
Ratio of
Year ended
Net Sales
Cost of Operations
for Year
(2) to (3)
Dec. 31, 1928
$ 907,267.72
$ 910,421.48
$517,919.23
1.74
June 30, 1929 *
561,514.52
492,409.95
505,215.12
1.94
June 30, 1930
763,216.71
716,859.48
508,537.22
1.41
June 30, 1931
407,769.45
468,485.85
450,007.88
1.04
June 30, 1932
238,474.28
305,257.15
367,363.66
.83
June 30, 1933
202,875.93
221,466.64
323,623.40
.68
June 30, 1934
275,068.72
260,752.11
318,708.85
.82
June 30, 1935
373,406.54
346,138.41
339,693.70
1.02
June 30, 1936
780,124.66
698,632.87
401,635.86
1.74
June 30, 1937
966,725.83
906,919.62
453,056.84
2.00
June 30, 1938
751,780.20
710,172.60
446,307.68
1.59
June 30, 1939
860,852.11
737,307.63
459,062.49
1.60
June 30, 1940
866,329.99
774,272.90
506,110.35
1.53
June 30, 1941
1,432,287.46
1,246,137.56
575,239.32
2.16
June 30, 1942
2,336,514.63
1,922,997.50
762,845.88
2.52
*107 (2) Cost of operations represents net sales less net profits before Federal income tax. A schedule showing for the years 1928 to 1942, inclusive, (1) net sales, (2) cost of operations, (3) net worth less fixed assets, and (4) ratio of (2) to (3), is as follows: Net Worth
less Fixed
Assets -
Average
Ratio of
Year ended
Net Sales
Cost of Operations
for Year
(2) to (3)
Dec. 31, 1928
$ 907,267.72
$ 910,421.48
$382,055.72
2.38
June 30, 1929 *
561,514.52
492,409.95
409,094.58
2.40
June 30, 1930
763,216.71
716,859.48
445,698.53
1.61
June 30, 1931
407,769.45
468,485.85
406,045.05
1.15
June 30, 1932
238,474.28
305,257.15
332,571.03
.92
June 30, 1933
202,875.93
221,466.64
286,377.07
.77
June 30, 1934
275,068.72
260,752.11
277,547.32
.93
June 30, 1935
373,406.54
346,138.41
289,739.83
1.20
June 30, 1936
780,124.66
698,632.87
320,366.26
2.18
June 30, 1937
966,725.83
906,919.62
346,154.81
2.62
June 30, 1938
751,780.20
710,172.60
359,045.23
1.98
June 30, 1939
860,852.11
737,307.63
400,611.63
1.84
June 30, 1940
866,329.99
774,272.90
434,067.93
1.79
June 30, 1941
1,432,287.46
1,246,137.56
454,959.98
2.74
June 30, 1942
2,336,514.63
1,922,997.50
635,528.30
3.19
*108 (2) Cost of Operations represents net sales less net profits before Federal Income Tax. During the taxable year the biggest share of petitioner's business went to the commercial trade, which included dealings with several large customers. Petitioner had approximately ten competitors who manufactured wooden office furniture. Petitioner uses oak, walnut, birch and maple wood, and until its importation was prohibited by the United States Government some mahogany. Petitioner purchases the lumber which it uses in the manufacture of its furniture. This lumber comes from logs having a 45 to 50 percent moisture content, and it takes a little over a year to dry and cure the larger pieces and about seven months for the smaller pieces. After the lumber is cured and taken from the kiln it takes about ten weeks to manufacture the furniture for an order and to deliver it to the customer. For a great number of years petitioner has had on hand a more or less constant supply of lumber. During the period 1936 to 1939 petitioner, in addition to its so-called commercial business, manufactured considerable furniture for use in new centralized schools which were being built through *109 the instrumentality of one of the Federal Government agencies. Such business was of a more or less temporary character. During these years petitioner had to meet increased competition in its commercial trade occasioned by the introduction and manufacture by other concerns of metal office equipment which resulted in a decline in its commercial business. On account of this increasing competition petitioner began to concentrate its attention on obtaining contracts with the United States Government. Petitioner also considered the possibility of manufacturing metal chairs. At informal conferences of petitioner's directors, consideration was given to putting in a steel or aluminum division. This would have meant the installation of new machinery and dies, and either the erection of an addition to its plant or the conversion of a part of its existing plant. This would have entailed a considerable expense. Consideration was also given to meeting the increased competition on the part of the makers of steel office furniture by manufacturing and selling wooden desks to match the office chairs which it produced and sold. Accordingly petitioner attempted to buy a desk company in the middle west *110 but a satisfactory agreement as to price was not reached and the negotiations lapsed. After the taxable year the advent of the war caused a prohibition of the use of metal in the manufacture of metal furniture, and therefore the solution of this problem of competition is no longer immediately imperative. Petitioner now manufactures chairs for sale to the United States Government. This business was begun in 1935 and is obtained by competitive bidding invited periodically by the Procurement Division of the Treasury Department. At all times throughout the taxable year and during the following year petitioner had ample cash on hand. During these years approximately $30,000 of petitioner's cash was represented by certificates of deposit in two different banks. Its remaining cash was carried in regular accounts in three different banks. No business policies for the taxable year or for future years were recorded in the petitioner's minute book. Petitioner's accumulated earnings and profits at the close of the taxable year amounted to $367,589.95. The net income of petitioner for the taxable year available for dividends, after deduction of $27,892.04 for current Federal income and excess-profits *111 taxes, was $95,652.44. After deduction of $7,674 for dividends on preferred stock, the earnings available for distribution on the common stock amounted to $87,978.44. The surtaxes avoided by the common stockholders for the calendar year 1939 by failure of petitioner to distribute the earnings of $87,978.44 available for distribution on such stock were as follows: Howard W. Gunlocke
$15,418.19
Henry G. O'Connor
801.09
Ernest Child
632.17
John Stahle
52.44
Total
$16,903.89 The total taxes (income tax and surtax) reported by the above stockholders on their returns and the additional taxes which would be payable by them if petitioner had distributed the $87,978.44, are as follows: Reported
Add. income
on return
and surtax
Howard W. Gunlocke
$243.82
$18,013.98
Henry G. O'Connor
373.26
1,210.78
Ernest Child
444.06
963.93
John Stahle
57.65
250.43
Total
$20,439.12
Petitioner's earnings and profits were permitted to accumulate beyond the reasonable needs of the business. Petitioner was availed of in the taxable year for the purpose of preventing the imposition of a surtax upon its shareholders. Opinion KERN, Judge: Section 102, Revenue Act of *112 1938, imposes a surtax on corporations improperly accumulating surplus "for the purpose of preventing the imposition of the surtax upon its stockholders or the shareholders of any other corporation"; and make the fact that the corporation is a "mere holding or investment company" prima facie evidence of such a purpose of avoidance. It further provides: (c) Evidence determinative of purpose. - The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary. The petitioner here is not a holding company but was organized to manufacture chairs and is still in that trade. The respondent has determined that there has been an accumulation by petitioner beyond the reasonable needs of its business and this determination has presumptive correctness. However, since the statutory provision is harsh in character, it must be applied with caution. United Business Corporation, 19 B.T.A. 809. This is especially true where the taxpayer *113 corporation is not a holding company but is engaged in a manufacturing business "which is so obviously hazardous from a business viewpoint." In such a case "we will hesitate before substituting our judgment upon the reasonableness of the corporate accumulations for that of the directors." Dill Manufacturing Co., 39 B.T.A. 1023, 1031. The respondent's attack centers on the position in which petitioner found itself at the close of the taxable year 1939. With much less earnings, he contends, petitioner for 15 years or more and until the depression of 1931, "maintained a fairly constant dividend record for its common stock"; whereas none have been paid since then until 1941 or 1942. At the end of 1939, petitioner had current assets of about $482,000, as against liabilities of only $51,000. It had cash on hand and liquidable securities of $180,811.01 as against $10,000 to $60,000 in the years before 1938, when the volume of its business in many of the years was almost as large. Its surplus was $303,339.95 at the end of 1939, indicating, if stock dividends charged to surplus account in 1921 and 1923 are added back, gains and profits accumulated of $367,589.95. *114 Petitioner had made a practice in years preceding the taxable year and until about the time of the hearing, when the last lot was acquired, of buying up its preferred stock which no longer appears on its books and has probably been retired; and in 1939 petitioner bought for $20,000 some $32,550 par value of its own common. What evidence is there, respondent asks, in the face of these accumulations and stock purchases, that petitioner was in need of its surplus as capital to be used in its business? Petitioner, on the other hand, contends that its accumulation of surplus during the taxable year was not beyond the reasonable needs of its business because it was justified by the following business purposes: (1) the reachievement of financial stability which it almost lost in 1933; (2) the purchase of its preferred stock and the elimination of danger of a change in the management through defaults in the payment of dividends on such preferred stock; (3) the creation of a reserve from which might be financed the purchase of new machinery and the conversion of its plant for the manufacture of a new product with which to meet competition; and (4) the need of large amounts of working capital *115 in the normal conduct of its business. Thereis the direct testimony of petitioner's general manager, who was also a director, to the effect that there was no intention on the part of petitioner or its officers or directors to avoid surtaxes, and that the payment of dividends on common stock was not even considered by the directors from the time the preferred stock went into default until the time when the preferred stock was purchased. Petitioner also points out that there was no policy of borrowing by the controlling stockholders in lieu of corporate distributions, nor the large investment of the corporate funds in the securities of other corporations. Cf. United Business Corporation v. Commissioner, supra; Helvering v. National Grocery Co., 304 U.S. 282. We have considered carefully the record in this case in the light of the able briefs filed by counsel; and, in spite of our reluctance to substitute our judgment for that of the officers and directors of a corporation actively engaged in business and successful over so many years, we are forced to the conclusion that the accumulation of earnings and profits by the petitioner during the taxable *116 year were beyond the reasonable needs of petitioner's business. In the year before the taxable year it had on hand over twice as much in cash and securities as it had ever had, and its surplus and the ratio of current assets to current liabilities were such as to satisfy, in our opinion, the requirements of the most conservative banker. Nevertheless, during the taxable year, petitioner increased its cash and securities by $45,000 and its surplus by over $100,000 without the payment of dividends. The reasons advanced by petitioner for its accumulation of earnings and profits during the taxable year are not convincing. For example, the argument that an accumulation was necessary in order to finance a possible change in its business due to competition is incomplete since nothing in the record indicates that such a change would entail an expenditure commensurate with the amount of earnings accumulated, and it is inconsistent with the retirement of petitioner's preferred stock, since if any considerable sum was necessary for that purpose, the contraction of petitioner's capital is not easily understood. Since we have concluded that petitioner accumulated its earnings and profits beyond *117 the reasonable needs of its business, it follows that the purpose of such accumulation was for the purpose of preventing the imposition of surtax upon its stockholders, since there is no clear preponderance of evidence proving the contrary. Therefore Reviewed by the Court. Decision will be entered for respondent. Footnotes
*. Treasury Stock $11,750.00 excluded. ↩
**. Treasury Stock $11,850.00 excluded.↩
*. Includes Federal income and excess-profits taxes for year ended 6/30/39 - $27,892.04. ↩
**. Includes Federal income tax for year ended 6/30/40 - $17,053.53.↩
*. Includes as follows: June 30, 1933 $23,310.27 Discount allowed. ↩
*. Includes as follows: June 30, 1940 $34,043.92 Special Discounts.↩
*. Exhibits 7 and F erroneously show $15,356.50 as discount on preferred stock. The $15,356.50 consists of the following, as shown by Exhibits 8-B, 14 and E: ↩
Discount on common stock purchased
$12,550.00
Discount on preferred stock purchased
2,730.00
Unpaid dividends on preferred stock cancelled
76.50
$15,356.50
**. Completes payment of arrearages of preferred dividends.↩
*. Six months.↩
*. Six months.↩